UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KIMBERLEY M. HOWARD, | : | Case No. 3:12-cv-168 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore unentitled to supplemental security income ("SSI"). (*See* Administrative Transcript at Doc. 9 ("PageID") (PageID 50-62) (ALJ's decision)).

**I.**

Plaintiff applied for SSI on December 27, 2007. (PageID 121-22). Plaintiff alleged disability since December 27, 2007, due to learning disabilities, knee pain, headaches, obesity, and vertigo. (PageID 56). Plaintiff's application was denied initially and upon reconsideration. (PageID 124-126, 130-32). Plaintiff went before an ALJ for a hearing on May 24, 2010. Subsequently, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (PageID 47-66, 69-119). The

Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (PageID 33-36). 20 C.F.R. §§ 416.1455; 416.1481.

Plaintiff is 28 years old. She graduated high school and received a certificate in computer office technology from Green County Career Center and attended community college. (Page ID 75-76, 312). Plaintiff stopped attending college because of her poor grades – she had a cumulative grade point average of 2.3/4.0. (Page ID 43, 312). Plaintiff has no past relevant work experience as the record notes she was unable to hold a job. However, Plaintiff has repeatedly stated that she wants to work. (PageID 60). She volunteered cleaning medical equipment for more than a year and is now working part time at a breakfast buffet where she cooks, replenishes items, and cleans. (*Id.*)

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1. The claimant has not engaged in substantial gainful activity since December 27, 2007, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: 1) learning disorder; 2) reading disorder; 3) borderline intellectual functioning; 4) anxiety; 5) chronic knee pain status post knee surgeries; 6) cervical headaches; 7) obesity; and 8) benign positional vertigo (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except: 1) occasional climbing of ramps or stairs; 2) no climbing of ladders, ropes, or scaffold; 3) occasional balancing, kneeling, crouching, or crawling; 4) no exposure to hazardous machinery or

2

    unprotected heights; 5) no driving or operating motor vehicles; 6) no complex written instruction; 7) limited to simple, routine, and repetitive tasks; 8) no fast paced production requirements; 9) involving only simple, work-related decisions; and 10) few, in any, work place changes.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on April 15, 1985 and was 22 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 27, 2007, the date the application was filed (20 CFR 416.920(g)).

(PageID 53-62).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to SSI. (PageID 62).

On appeal, Plaintiff argues that: (1) the ALJ erred in failing to give the treating physicians controlling weight; and (2) the ALJ erred in failing to find that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. The Court will address each error in turn.

3

**II.**

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

As a teenager, Plaintiff had a tested Verbal IQ of 91, a Performance IQ of 74, and a Full Scale IQ of 81, which is considered in the low average range.  (PageID 225). While Plaintiff testified that she stopped attending college because of her poor grades, her transcript shows a cumulative grade point average of 2.3/4.0.  (PageID 43, 312).

On February 12, 2008, Plaintiff was treated at Wright Patterson Air Force Base Hospital ("WPAFBH"), where she received all of her general medical care.  (PageID 387).  The treatment notes stated that Plaintiff had developmental delays, but drove and attended school.  (*Id.*)  The following day Plaintiff saw Dr. Uzpen, a physician at WPAFBH, and requested testing for a developmental delay.  (PageID 383).  She stated that she graduated high school, but had difficulty throughout her education and was unable to take college level courses or hold down a job.  (*Id.*)  Plaintiff also reported that she could not do activities of daily living on her own, remember directions, or comprehend things she read without her mother's help.  (*Id.*)

On March 19, 2008, Dr. Flexman, a clinical neuropsychologist, evaluated Plaintiff as part of Plaintiff's attempt to stay on her parents' insurance as a result of her learning disability.  (PageID 924-26).  Plaintiff reported that she had tried various jobs, but had not been able to continue working because she had difficulty learning tasks and was not able to complete the work quickly enough.  (PageID 924).  She also reported that she was unable to learn how to use a cash register at her last job and had trouble following

directions in the past.  (*Id.*)  Plaintiff handled her own finances and denied any emotional difficulties or problems with her temper.  (PageID 924-25).  Dr. Flexman diagnosed Plaintiff with anxiety disorder with depressive features, a reading disorder, a cognitive disorder, and assigned Plaintiff a Global Assessment of Functioning 2 ("GAF") score of 60.[1]  (PageID 926).  He opined that Plaintiff was experiencing some significant cognitive difficulties, especially in the learning areas, and that her auditory processing of information was impaired.  (*Id.*)  Dr. Flexman further opined that Plaintiff would have difficulties with independent living and that she would benefit from a cognitive rehabilitation program and a referral to the Bureau of Vocational Rehabilitation.  (*Id.*)

 Psychological consultant Dr. Bonds evaluated Plaintiff on March 20.  (PageID 930-36).  He opined that Plaintiff had sufficient judgment and reasoning abilities to be able to live independently, make important decisions about her future, and manage her own funds.  (PageID 933, 936).  Plaintiff completed a Wechsler Adult Intelligence Scale-Third Edition and obtained a Verbal IQ score of 89, a Performance IQ score of 68, and a Full Scale IQ score of 77 putting her in the Borderline Intellectual Functioning range.  (*Id.*)  Dr. Bonds assigned Plaintiff a GAF score of 60.  (PageID 935).  He opined that Plaintiff's mental ability to relate to peers, supervisors, and the public was not impaired.

---

[1]  The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults.  A score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

(PageID 936). Plaintiff's mental ability to understand, remember, and follow instructions was also not significantly limited nor was her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. (*Id.*) Finally, Dr. Bonds opined that Plaintiff's ability to withstand the stress and pressure associated with day-to-day work activities was not impaired, though she would have mild problems handling work demands for speed, accuracy, and productivity, and for dealing with changes in the workplace. (*Id.*)

Plaintiff was examined by state agency consulting physician Dr. Cantor on March 25, 2008. (PageID 940-43). Based solely on Plaintiff's reports, Dr. Cantor opined that Plaintiff had a history of a learning disability with restricted intelligence. (PageID 943).

Dr. Uzpen completed a Medical Sufficiency Statement on April 8, 2008. (PageID 319). In it, he referred to the testing completed by Dr. Flexman and opined that Plaintiff was not capable of independent living. (*Id.*) Another Medical Sufficiency Statement was completed on April 9, 2008 and Plaintiff was determined to be incapable of self-support. (Page ID 1344). A re-evaluation was scheduled for 2009. (*Id.*)

State agency psychological consultant, Dr. Edwards, reviewed Plaintiff's records and completed a Psychiatric Review Technique on April 17, 2008. (PageID 950-67). Dr. Edwards commented favorably on Dr. Bonds' findings. (PageID 966). Dr. Edwards opined that Plaintiff would have some mild, or at the most, moderate limitations in her ability to carry out more than simple tasks, but that she retained the capability to understand, remember, and carry out simple and slightly more complex directions in a

7

routine work setting. (PageID 966). Finally, Dr. Edwards opined that Plaintiff had mild restrictions of activities of daily living, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (PageID 960). Plaintiff had no episodes of decompensation. (*Id.*)

A physician at WPAFBH, Dr. Thomas, wrote a letter on May 16, 2008 opining that Plaintiff was currently unable to care for herself for basic needs and could not clean her home, cook, or do laundry. (PageID 968). He further stated that she was unable to hold a job due to her inability to take commands and because she frequently forgot what to do or how to do things. (*Id.*) She was also unable to handle her finances. (*Id.*) Dr. Thomas further noted that Plaintiff tended to "exaggerate her abilities when asked" and if "asked if she can perform a task she answers in the affirmative, whether she can or not." (*Id.*)

Dr. Lewin, a state agency psychological consultant, completed a Psychiatric Review Technique on August 10, 2008. (PageID 1002-19). She diagnosed Plaintiff with a reading disorder, a cognitive disorder NOS, and anxiety disorder NOS with depressive features. (PageID 1007, 1011). The remainder of Dr. Lewin's findings echoed Dr. Edward's opinion closely. She opined that Plaintiff retained the capability to understand, remember, and carry out simple and slightly more complex directions in a routine setting, and could relate to co-workers and the general public without difficulty. (PageID 1004). Further, Dr. Lewin found that Plaintiff could adapt to daily work with regular supervision. (*Id.*) In all, Dr. Lewin opined that Plaintiff had mild restrictions of activities

of daily living, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (PageID 1016). Plaintiff had no episodes of decompensation. (*Id.*)

Plaintiff was referred to HIRE by the Bureau of Vocational Rehabilitation and her initial evaluation was completed on September 3, 2008. (PageID 317, 320-40). Overall, the evaluation concluded that Plaintiff would not be able to maintain independent, competitive, gainful employment due to poor decision-making and judgment skills and significant difficulties dealing with new information. (*Id.*) The evaluation recommended vocational development in the HIRE program to develop work skills and also stated that the use of attention-enhancing medications would potentially be helpful. (*Id.*) Further, it stated that Plaintiff was significantly impaired in terms of her ability to maintain any self-directed, independent functioning. (*Id.*) Much of this evaluation was based on neuropsychological, cognitive, and behavioral testing performed by Dr. Arnold on August 6 and 7, 2008. (PageID 324-28). Dr. Arnold opined that Plaintiff had a non-verbal learning disorder and was inconsistent in how she maintained focused attention to task. (PageID 325). Plaintiff's Full Scale IQ was 84 with a Performance IQ of 74 and a Verbal IQ of 93. (PageID 327). Dr. Arnold opined that Plaintiff would have problems in new learning situations "where instructions are not clearly specified with absolute directions as to her performance." (PageID 325-26). He also opined that others might overestimate Plaintiff's abilities because of her ability to acquire pieces of verbal information through repetitive practice. (PageID 326). Dr. Arnold further posited that it

was possible that "there has been some impairment in cognitive skills mediated through the right fronto-parietal area of the brain" which may have occurred because of an injury to the central nervous system or as part of Plaintiff's development. (*Id.*) He recommended vocational development and medications to improve Plaintiff's attention. (*Id.*)

On September 8, 2008, Plaintiff saw Dr. Uzpen and requested medication to help her concentration. (PageID 1110-14). On September 9, 2008, Danielle Lashomb completed a report at the behest of the State opining that Plaintiff could understand, remember, and carry out simple and slightly more complex directions in a routine work setting, could relate to co-workers and the general public without difficulty, and could adapt to daily work with regular supervision. (PageID 209). Based on this skill set, Lashomb listed three jobs that Plaintiff could hold. (*Id.*)

Plaintiff returned to WPAFBH in January and February 2009 and reported that she was doing well on Concerta, a medication to help with her attention, that she had increased concentration and focus, and that her mentor at the vocational program noticed an improvement in her work habits. (PageID 1187, 1201). On May 11, 2009, Plaintiff requested an increased dose of her medication as she was having some trouble with attention since her new job had less hands-on, repetitive functions. (PageID 1249).

From May through July 2009, Plaintiff saw Dr. Pugar, a neurologist. Dr. Pugar examined Plaintiff for a cognitive disorder and stated that Plaintiff and her mother reported that Plaintiff's cognitive symptoms worsened after a car accident in 2007.

10

(PageID 1088-90). Plaintiff had a brain MRI, a sleep study, and an EEG with normal results. (PageID 1323-27). As a result of these tests, Dr. Pugar opined that Plaintiff's problems were not neurologic and were instead behavioral. (PageID 1085-86). He opined that Plaintiff had baseline learning disability, adult attention deficit disorder, and some clinical depression. (*Id.*) He further reported that both Plaintiff and her mother "readily" admitted Plaintiff was doing better on Concerta. (*Id.*)

Dr. Gilchrist completed a neuropsychological evaluation in July to determine if Plaintiff was experiencing cognitive difficulties due to post-concussion syndrome from a car accident in 2007. (PageID 1328-31). Like Dr. Pugar, Dr. Gilchrist concluded that Plaintiff did not have a neurologic problem. (PageID 1331). He did not find a clinical memory impairment, but opined that Plaintiff had some "difficulty with overall functioning" which pre-dated the car accident. (*Id.*) Dr. Gilchrist noted that Plaintiff reported that the Concerta helped her attention and concentration and opined that Plaintiff may have "some mild degree of depression" which contributed to her difficulties with concentration and attention. (*Id.*)

On August 12, 2009, Plaintiff returned to WPAFBH and reported that the Concerta was working well. (PageID 1309).

Plaintiff again reported that the Concert was working well in February 2010. (PageID 1299). She returned to WPAFBH several times from May to November 2010, and, each time, stated that the Concerta was working well and that she was able to do

11

normal daily activities without difficulty and that she was working at a hotel.  (PageID 1277, 1403, 1407, 1414, 1443).

Dr. Flexman completed a second evaluation of Plaintiff on November 12, 2010.  (PageID 1336-39).  He diagnosed Plaintiff with anxiety disorder with depressive features, cognitive disorder NOS, a reading disorder, and a learning disorder NOS (nonverbal learning disability).  (PageID 1338).  He also assigned her a GAF score of 50 in the past year.[2]  (*Id.*)  Dr. Flexman opined that Plaintiff had a significant problem with her social judgment, decision making abilities, conceptualization abilities, and her ability to assess her environment and relationship with others.  (PageID 1339).  He opined that this would markedly impact her social judgment in a work environment and that she would need a great deal of structure and supervision and would not be able to work independently for any length of time.  (*Id.*)  Further, he opined that Plaintiff's ability to handle her own finances and make judgments was impaired.  (*Id.*)  Plaintiff's ability to get along with co-workers and supervisors and deal with the public was limited because of her diminished emotional intelligence and emotional skills.  (*Id.*)  Further, her ability to withstand the stress of an ordinary work environment was moderate to markedly impaired.  (*Id.*)

Plaintiff went to WPAFBH in February, April, and June 2011 and reported that she had been on Concerta for the past two years with good results and was able to do her normal activities without difficulty.  (PageID 1352, 1368, 1398).  The notes from these

---

[2]  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

12

visits stated that Plaintiff had a recent psychological evaluation that stated that she would likely not be able to hold a permanent job.  (*Id*.)

**Plaintiff's Testimony**

Plaintiff testified that she worked two, four-hour days at a buffet warming up eggs and bacon in the microwave and replenishing other foods and beverages.  (PageID 76).  Previously, she had volunteered cleaning medical equipment for about a year.  (PageID 77).  Plaintiff testified that she did a little bit of housework, but her mother did "all of that" and that she could not cook herself a meal.  (PageID 86-87).  She went shopping with her mother.  (PageID 87).  Plaintiff testified that her hobbies included singing, playing the piano, watching TV, and that she had a friend that she saw occasionally.  (PageID 87-88).  She also used the computer for entertainment, e-mail, and used social networking.  (PageID 89).

### B.

Plaintiff alleges that the ALJ erred in failing to give the treating physicians controlling weight.

The Regulations clearly state that a treating doctor's opinion must be given "controlling weight" if "well-supported" by objective evidence.  20 C.F.R. § 1527(d)(2).  More weight is generally given to treating sources because they can provide a detailed, longitudinal picture of one's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from objective findings alone or from reports of individual examinations such as consultative examinations.  *Id.*  "If the opinion

13

of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record a as whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 1527(d)(2)).

Plaintiff argues that the ALJ gave too much weight to the opinions of Dr. Edwards and Dr. Bonds and did not adequately consider the opinions of Plaintiff's "treating" physician Dr. Thomas as well as the opinions of Dr. Flexman and Dr. Arnold.[3]

Plaintiff's RFC is fairly restrictive. The ALJ took into account Plaintiff's limited abilities to maintain concentration and attention and to complete complex tasks. In fact, the ALJ credited the findings of Dr. Thomas, Dr. Flexman, and Dr. Arnold as well as Plaintiff's testimony regarding her limited daily activities. (Page ID 54).

The ALJ did not explicitly discuss the opinion of Plaintiff's "treating" physician, Dr. Thomas, however the Sixth Circuit has held that an ALJ's failure to explicitly evaluate a treating physician's opinion may be harmless error in three situations: (1) the

---

[3] Additionally, Plaintiff argues that the ALJ did not adequately consider the opinion of Mr. Schwendeman, the HIRE occupational therapist. Plaintiff saw Mr. Schwendeman one time. (Page ID 333-36). The resulting opinion echoed many of Dr. Arnold's concerns as far as Plaintiff's difficulties with learning new tasks and exaggerating her own abilities. *Id*. Thus, althought the ALJ did not explicitly discuss Mr. Schwendeman's opinion in her decision, she considered his concerns through her treatment of Dr. Arnold's opinion. Additionally, Mr. Schwendeman is not an "acceptable medial source" and thus the ALJ could not use his opinion to establish the existence of a medically determinable mental impairment. 65 Fed. Reg. 50746, 50761 (2000); SSR 06-03p.

14

opinion is so patently deficient it could not possibly be credited; (b) the Commissioner adopts the opinion or makes findings consistent with it; and (c) the Commissioner has indirectly addressed the opinion through his analysis of other evidence. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). First, Dr. Thomas does not qualify as a "treating" physician. While Plaintiff went to WPAFBH regularly to receive care, there are few records that indicate that she actually saw Dr. Thomas. In fact, there are only two records that indicate that Plaintiff interacted with Dr. Thomas at all, and in both he simply referred Plaintiff to specialists for knee and back pain. (Page ID 992-94, 1140). *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'") (quoting 20 C.F.R. § 404.1502).

Even if Dr. Thomas was Plaintiff's treating physician, the fact that the ALJ failed to explicitly consider his opinion in her decision was harmless error. Specifically, Dr. Thomas's opinion was conclusory in that it stated that Plaintiff was incapable of holding a job with virtually no specific examination of Plaintiff's abilities. Such an opinion is not entitled to deference. *See* 20 C.F.R. § 416.927(e); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) ("conclusory statements from physicans are properly discounted by ALJ's"). Additionally, the substance of Dr. Thomas's opinion – that Plaintiff had difficulty taking commands, forgot how to do things, and exaggerated her abilities – was all included in other opinions considered by the ALJ. Dr. Arnold's

15

opinion detailed that Plaintiff had difficulty learning tasks and that she tended to overstate her abilities.  (Page ID 324-28).  Therefore, the ALJ implicitly considered Dr. Thomas's opinion in her decision.  Moreover, Dr. Thomas's opinion is further entitled to little weight because there is no indication that he specialized in psychological care or provided any psychological or neurological treatment.  Any psychological and neurological services Plaintiff received were from other sources.  (Page ID 924-26, 1085-86, 1088-90, 1328-31, 1336-39).  Because Dr. Thomas is not a specialist in this field, unlike Drs. Bonds and Edwards, his opinion is entitled to less weight.  *See Sherrill v. Sec'y of HHS*, 757 F.2d 803, 805 (6th Cir. 1985) (internist medical expert's opinion given less weight in mental impairment case).

   Plaintiff relies on letters from Dr. Thomas and Dr. Uzpen, another physician at WPAFBH, to argue that the ALJ erred in deferring to the opinions of the state agency consultants and to bolster support for Dr. Flexman's opinion (Page ID 968-69).  It is unclear what testing, if any, any physician at WPAFBH performed independently.  Instead, both of these letters, particularly the one written by Dr. Uzpen, appear to be based on Dr. Flexman's analysis.  (Page ID 969).  Other notes from physicians at WPAFBH explicitly state that the doctor or physician assistant simply reviewed and agreed with Dr. Flexman's findings.  (Page ID 102).  *See Young v. Sec'y of HHS*, 925 F.2d 146, 151 (6th Cir. 1990) (Court rejected a treating physician's opinion because that physician did not conduct psychological or psychiatric tests in forming his opinion).

16

Plaintiff also suggests that the ALJ should have given the opinions of Dr. Flexman and Dr. Arnold more weight than those of the state agency consultants, Drs. Bonds and Edwards.  However, Drs. Flexman and Arnold only saw Plaintiff once or twice and were not treating sources.  (Page ID 324-28, 924-26, 1336-39).  Dr. Flexman wrote two medical opinions regarding Plaintiff's abilities – one in 2008 and one in 2010.  (Page ID 924-26, 1336-39).  There is no indication that Dr. Flexman saw Plaintiff other than those two times or had any sort of ongoing treating relationship with Plaintiff.  The same is true of Dr. Arnold.  Dr. Arnold evaluated Plaintiff when she first entered the HIRE program, but there is no evidence in the record that Dr. Arnold had any further relationship with Plaintiff.  (Page ID 324-28).  Because Drs. Flexman and Arnold were not treating sources, there is no presumption that their opinions are entitled to any weight.  *See* 20 C.F.R. § 416.927(d)(2) (generally more weight is given to opinions from a treating source).

The ALJ also considered how Plaintiff's condition improved after she began taking Concerta and participating in the HIRE program, and noted that Drs. Flexman and Arnold were responsible for Plaintiff pursuing this treatment.  Dr. Flexman urged Plaintiff to enroll in the HIRE program to help her remediate some of her learning problems and Dr. Arnold was one of the professionals who stated that Plaintiff would benefit from concentration enhancing medications.  (Page ID 326, 926).  The ALJ reasonably considered the fact that Plaintiff's condition improved with these measures. *See Eddy v. Comm'r of Soc. Sec*., No. 12-1217, 2012 U.S. App. LEXIS 24709, at *1 (6th

17

Cir. Nov. 29, 2012) (ALJ properly considered that treatment had stabilized or improved a claimant's condition). Even before Plaintiff began this treatment, Dr. Flexman assigned Plaintiff a GAF score of 60 in 2008, indicating only moderate symptoms. (Page ID 926).

After she began treatment, Plaintiff continually stated that the Concerta, which she started taking at the end of 2008, was helping with her concentration and attention. (Page ID 1085-86, 1187, 1201, 1277, 1299, 1309, 1352, 1368, 1398, 1403, 1407, 1414, 1443). Further, her mentor at the HIRE program noticed an improvement in her work habits after she began taking medication. (Page ID 1187). These improvements led Plaintiff to volunteer for a year cleaning medical equipment and to have a part-time job at a buffet. (Page ID 76-77). While a part-time job is not equivalent to full-time employment, the ALJ reasonably considered it in her determination that Plaintiff was capable of working with significant nonexertional restrictions.

Moreover, to the extent Drs. Abarams and Flexman opined that Plaintiff had "difficulties," "limit[ations]," and "problems" with certain mental functions, the ALJ agreed, finding that Plaintiff had multiple severe mental impairments, limiting her to simple, routine and repetitive tasks without either complex written instructions, fast-paced production requirements, more than simple decisionmaking, or more than few changes. (Page ID 58). Moreover, the ALJ agreed that Plaintiff could not succeed in an ordinary work environment and that she could not perform regular work, or even regular simple work – he restricted her in significant ways to ensure that she could only perform a highly restricted range of work.

Plaintiff's argument that the ALJ relied too heavily on the opinions of Drs. Bonds and Edwards lacks merit because it is nothing more than a disagreement about how the ALJ weighed various medical opinions, "which is clearly not a basis for…setting aside the ALJ's factual findings." *Mullins v. Sec'y of HHS*, 836 F.2d 980, 984 (6th Cir. 1987). It is the Commissioner's function to consider all of the evidence and resolve conflicts in the medical evidence. *Hardaway v. Sec'y of HHS,* 823 F.2d 922, 927 (6th Cir. 1987). Here, the ALJ reviewed all the evidence and reasonably determined that the opinions of Drs. Edwards and Bonds were most consistent with the overall record.

### C.

Next, Plaintiff alleges that the ALJ failed to find that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

The ALJ determined that Plaintiff was moderately impaired in her activities of daily living and her ability to maintain concentration, persistence, and pace. (Page ID 54, 56). Thus the ALJ found that Plaintiff did not meet the listings because she was not markedly limited in two areas of functioning. "Discretion is vested in the ALJ to weigh all the evidence," and he did not abuse that discretion in this instance. *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009).[4]

---

[4] *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Kimberley Howard was not entitled to supplemental security income, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED**.

Date: 7/1/13                                         *s/ Timothy S. Black*
                                                                            Timothy S. Black
                                                                            United States District Judge